## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

_____

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 06-CR-20055** |
| | ) | |
| **BRIAN K. WASSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>OPINION</u>

On May 2, 2007, Defendant, Brian K. Wasson, was charged in a third superseding indictment (#28) with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and seven counts of aiding the filing of a false tax return, in violation of 26 U.S.C. § 7206(2). Defendant was charged along with two co-defendants, Joseph Starns and John Wolgamot. Starns died on August 16, 2007, and all pending charges against him were dismissed on September 5, 2007. On August 21, 2008, pursuant to a written plea agreement (#57), Wolgamot plead guilty to count 6 of the third superseding indictment, which charged him with aiding the filing of a false tax return. Defendant Wasson proceeded to a bench trial which commenced on March 2, 2009, and concluded on March 17, 2009.

Following the bench trial, Defendant, through counsel, filed his proposed Conclusions of Law and Fact (#96) and a Motion for Judgment of Acquittal (#97). The Government has filed its written Closing Argument (#99). This court heard all of the testimony presented at the bench trial and has reviewed its extensive notes taken during the trial, the exhibits introduced into evidence, and the arguments of the parties. Following this careful and thorough consideration, this court now finds that the Government proved, beyond a reasonable doubt, that Defendant is guilty of Count 1,

Count 2, Count 3, Count 4, Count 5, Count 6 and Count 7 of the third superseding indictment and states its specific findings of fact in this written Opinion pursuant to Rule 23(c) of the Federal Rules of Criminal Procedure.  Because this court has found Defendant guilty of the charges against him, Defendant's Motion for Judgment of Acquittal (#97) is DENIED.  This case remains set for a status conference on December 8, 2009, at 1:30 p.m. so that a sentencing hearing can be scheduled.

This court notes that Defendant filed a Motion for Briefing Schedule and Leave to File Reply Brief (#100).  For the reasons that follow, this Motion is DENIED.  Defendant also filed a Motion for Funds for Expert (#94).  This Motion is GRANTED and funds are authorized up to the statutory maximum of $1,600.00.

MOTION FOR LEAVE TO FILE REPLY

On November 18, 2009, Defendant, through counsel, filed a Motion for Briefing Schedule and Leave to File Reply Brief (#100).  Defendant stated that the Government and Defendant had filed their briefs following the bench trial in this case and the court "has not otherwise provided the Defendant an opportunity to respond to the Government's brief."  Defendant asked this court to set a briefing schedule allowing Defendant to respond to the Government's brief and the Government to respond to Defendant's reply.

On July 30, 2009, this court set a briefing schedule in this case.  This court set a date for Defendant to file findings of fact and conclusions of law and set a date for the Government to respond.  This court believed that this briefing schedule was adequate to allow the parties to set forth their arguments in this case.  Defendant has not given any reason why a reply brief is necessary,

2

other than he wants to file one.[1]  He also has given no indication as to the amount of time he would need to file his reply.  This court now concludes that the case has been adequately and thoroughly briefed.  At some point, in every case, briefing must end so the case can be decided.  Accordingly, Defendant's Motion for Briefing Schedule and Leave to File Reply Brief (#100) is DENIED.

BENCH TRIAL

The bench trial in this case took twelve days, during which the Government literally presented a "mountain" of evidence.  It presented the testimony of IRS Special Agents Bernard Coleman, Chris Thomson, and Mike Thole, IRS Revenue Agent James Pogue, as well as the testimony of Brian Brooks, William Steinmetz, Everett Alan Bugg, Robert Donahue, Paul Tatman, Dennis Birky, Paul Cheatham, Doug and Dennis Frichtl, Beth Wasson, Paul Buenting, David Dillon, John Wolgamot, David Kindred, and Terry McDaniel.  Approximately 900 documentary and summary exhibits were admitted into evidence.  This court will not begin to discuss all of the evidence presented, but will just set out a summary of some of the evidence.

The evidence presented at the bench trial showed that the Aegis Company (Aegis) was founded sometime in the 1990's in Palos Hills, Illinois.  Defendant was a resident of Tilton, Illinois, and was a representative of Aegis along with co-defendant Starns, Michael Vallone, Robert Hopper, Edward Bartoli and William Cover.  Beginning in 1994, Aegis and its representatives devised, organized, promoted and sold various financial instruments, known as domestic and foreign "trusts," to federal taxpayers in exchange for substantial fees.  There was no change in the taxpayers' control over their assets and income after setting up the "trusts."  The purpose of marketing the trusts to

---

[1]  This court notes that the bench trial concluded on March 17, 2009, and Defendant's Conclusions of Law and Fact (#96) and Motion for Judgment of Acquittal (#97) were filed on October 9, 2009, almost seven months later.  Defendant was, obviously, allowed adequate time to present this court with his arguments in this case.

3

federal taxpayers was to assist the taxpayers in concealing the taxpayers' assets and income from the IRS, resulting in the reduction of the income tax paid to the IRS.  In approximately 1997, Defendant and Starns established a business known as Midwest Alternative Planning (Midwest), which was located in Danville, Illinois.  Defendant and Starns, through Midwest, promoted the Aegis system of "trusts" to various taxpayers.  Wolgamot was an attorney in Danville and was a business associate of Defendant and Starns.  Wolgamot worked with them in promoting the Aegis trust scheme.  David Dillon was a tax preparer in Charleston, Illinois and Paul Buenting was a tax preparer in Gifford, Illinois.  Dillon and Buenting were business associates of Defendant and Starns and prepared tax returns for their Aegis clients.  Defendant eventually became a member of an Aegis advisory body known as the Aegis Fortress Advisory Group.

The evidence showed that Aegis and its representatives caused taxpayers to assign and transfer some or all of their income and assets to the trusts, then omit or deduct the amount of the assignments and transfers from their individual tax returns.  The taxpayers would then falsely claim that the trusts had actually earned the income for a particular tax year.  This resulted in substantially reducing or eliminating any tax liability for the individual taxpayer.  In addition, Aegis and its representatives further caused taxpayers to assign and transfer the income and assets from trusts to additional trusts and entities and then claim false deductions from income on the tax returns for those entities, which substantially reduced or eliminated tax liability for those entities, sometimes filing no federal income tax return for the entities whatsoever.  Aegis and its representatives assisted taxpayers in carrying out this fraudulent paper scheme, while at the same time assisting taxpayers in maintaining complete access to and control of their assets and income.

The most egregious example of the use of the Aegis system presented during the trial was

4

the testimony of David Kindred.  Kindred testified that he is a medical doctor specializing in obstetrics and gynecology.  He has been in solo practice in Morton, Illinois, since 1994.  Kindred testified that Defendant visited him at his home in 1996.  Kindred stated that, in December 1996, he paid Aegis $45,000 for the trust system.  Midwest received $20,200 of this amount as a commission.  Kindred also paid annual management fees in the amount of $6,000 to Midwest.  Kindred testified that Defendant accepted the management fees.  Based upon Kindred's testimony and the documents introduced into evidence, the Government showed that Kindred, who earned as much as $1,000,000 per year from his medical practice, paid almost nothing in taxes for the tax years 1996, 1997, 1998, 1999, and 2000.  Astoundingly, in 1997, Kindred received an earned income credit of $754.  Kindred testified that Buenting prepared his income tax returns for the 1996 and 1997 tax years and Dillon prepared his tax returns after that.  Kindred testified that, in 1998, he received a letter from Merrill Lynch which indicated that it would not open an account for Kindred's Aegis trust because those types of trust could be used to illegally shelter assets from the IRS and were the subject of an ongoing IRS investigation.  Kindred faxed the Merrill Lynch letter to Midwest.  On June 16, 1998, Defendant faxed a copy of the letter to Vallone with a cover letter in which Defendant said, "I need to know how you wish to proceed with this matter."  The evidence showed that Kindred did come to the attention of the IRS and Kindred received his first IRS audit letter in May 2001.  Kindred testified that Defendant was involved in responding to the IRS.  Kindred testified that Defendant never told him to cooperate with the IRS.  Kindred testified that he has paid some back taxes and penalties to the IRS.  Kindred testified that he invested $1,000,000 with an Aegis related entity, through Defendant and Vallone, and was told that the money he invested was stolen.  Kindred testified that he is currently trying to claim the $1,000,000 as a

business loss with the IRS.

The Government also presented evidence from numerous other witnesses regarding their involvement with the Aegis system. William Steinmetz testified that he worked as a pathologist in Danville, Illinois, from 1982 to 2008. He testified that Wolgamot introduced him to Defendant in 1997 to discuss the Aegis system. He paid $59,000 for the trust system and also paid Midwest annual fees for services. Steinmetz's testimony, and the exhibits introduced into evidence, showed that he reduced his taxes significantly by using the Aegis system. Steinmetz testified that he stopped using the Aegis system in 2004. He plead guilty to a misdemeanor state charge regarding tax returns and received probation. Steinmetz testified that he went to tax court and a March 30, 2005, decision found that he owed back taxes and penalties. Steinmetz testified that he currently owes $3 million in taxes, interest and penalties. He testified that the IRS wants him to pay $11,000 per month.

Everett Alan Bugg testified that he had conversations with Defendant in 1997 and 1998 and Defendant convinced him to use the Aegis system. Bugg gave Defendant a check for $18,000 made out to Aegis. Defendant told him this amount was tax deductible. Defendant also referred him to Dillon and Dillon prepared his tax return for the 1998 tax year. Bugg testified that he received an audit letter from the IRS regarding his trusts in April 2000. Bugg testified that he contacted Defendant and Defendant told him to ignore it and not to respond. Bugg testified that Defendant told him not to cooperate because it would cause problems for others. Bugg stated that Defendant said to use the Fifth Amendment. Bugg testified that he eventually paid the IRS $117,308 in additional tax and interest.

Dennis Frichtl testified that he sold a business in 1999 and netted $5.4 million. He avoided paying taxes on his income from the sale through use of the Aegis trust system. Frichtl testified that

he worked with Defendant regarding his Aegis trusts.  Frichtl testified that the Aegis system "looked legal and legitimate."  Frichtl testified that he invested $4 million overseas with Defendant and Aegis.  While involved with Defendant in the Aegis system, Frichtl sent a "Statement in Lieu of Return" and other correspondence to the IRS for the calendar year 2002.  The documents included a disclaimer of citizenship.  Frichtl testified that he is currently in the custody of the Federal Bureau of Prisons following a guilty plea in the Southern District of Illinois.  Frichtl's plea agreement was admitted into evidence and showed that Frichtl entered a plea of guilty to the charge of conspiring to impede, impair, obstruct and defeat the IRS in the ascertainment, computation, assessment and collection of income taxes.  He was sentenced to a term of 26 months.

Doug Frichtl testified that he is Dennis Frichtl's brother and that he is also in the custody of the Federal Bureau of Prisons.  He stated that he started working with Defendant in 1999 or 2000.  He testified that he was ordered by United States District Judge Patrick Murphy to produce books and records in late 2001.  Doug Frichtl testified that Defendant was involved in refusing to give the books and records to the IRS.  While taking advice from Defendant, Doug Frichtl sent a "Statement in Lieu of Return" and other correspondence to the IRS for the calendar year 2001.  The documents included a disclaimer of citizenship.

Paul Tatman testified that he met with Defendant regarding setting up an Aegis trust system.  Tatman testified that he paid $70,000 to $80,000 for the system.  He testified that he decided not to use the system because he thought it was "too good to be true."  Tatman testified that Defendant told him on several occasions that the IRS code was illegal.

Paul Cheatham testified that he worked with Starns and Defendant regarding trusts to reduce the cost of his taxes.  Cheatham testified that he went to Chicago in 1994 to meet with other

representatives of Aegis. Cheatham set up an Aegis trust system and Buenting prepared his tax returns after April 1997. Cheatham testified that, when he had conversations with Defendant and Starns, Defendant spoke the most. In July 2000, he attended an Aegis meeting and was advised to use the "audit arsenal." Cheatham testified that this made him think it was not legal. Cheatham entered into a closing agreement with the IRS in 2001, and paid the IRS $250,000 in taxes and interest.

Brian Brooks testified that he met Defendant in 1997. He testified that he paid Aegis $10,000 on December 20, 1997, as a first payment for an Aegis trust system. Brooks testified that Defendant told him the system was legal. Brooks testified that the trust documents were not prepared in 1997. When the trust documents were created in 1998, they were backdated 1997 so he could use the trust system when he filed his taxes for the 1997 tax year. He testified that Dillon prepared his taxes for the 1997 tax year as if the trusts were in place in 1997. Brooks testified that he paid a $4,000.00 annual fee for the system. Brooks testified that he got a notice from the IRS in May 2000 regarding an audit of one of his trusts for the 1997 and 1998 tax years. Brooks testified that he called Midwest about the notice and was given a letter to send to the IRS. Brooks continued to follow Midwest's advice about how to deal with the IRS. On February 8, 2001, Brooks sent a letter to the IRS, which was provided by Midwest, which questioned the IRS and tax court authority and included an affidavit in which Brooks and his wife said they were not citizens of "the geographical United States." Brooks testified that he continued to use the Aegis system and continued to question the IRS's authority. On June 18, 2002, Brooks received a notice of intent to levy from the IRS seeking $1,694,430.68. Brooks testified that he nevertheless continued to file his tax returns the same way, using the Aegis system. On October 18, 2002, Defendant signed a letter

8

to the IRS requesting an extension on Brooks' behalf.

Brooks eventually decided to get out of the system and met with Dillon and Attorney Brent Winters. Brooks had Dillon prepare amended tax returns as if the trusts never existed. Brooks paid back taxes and penalties to the IRS. Brooks testified that Defendant called him after his meeting with Dillon and Winters. Brooks said that Defendant told him to be careful in getting out of the system. Brooks testified that Defendant offered to recommend an attorney, but he wanted to disassociate himself from the trusts.

Terry McDaniel testified that he met Defendant in 2000. McDaniel testified that he and his wife purchased a motel in the Florida Keys and sold it in February 2000, netting $1 million. McDaniel testified that he met Defendant in 2000 and Defendant said they could save tax dollars from the sale of the motel. McDaniel testified that he paid around $50,000 for the trust system. McDaniel testified that he was told there was a tax loophole which was legal. McDaniel testified that he filed a tax return for the 2000 tax year which showed that he owed nothing in taxes based upon the sale of the motel. McDaniel testified that he was contacted by the IRS regarding his offshore credit card, which was part of the system. McDaniel testified that his attorney advised him to file an amended return. He stated that he owed the IRS $500,000.

Dennis Birky testified that he has known Defendant since the 1980s. He testified that Defendant mentioned Aegis to him a year or two before 1995. Birky testified that Defendant told him the Aegis system was a way to protect assets and decrease tax liability. Birky testified that he went to the Aegis office in November 1995 with Defendant and Starns to sign documents. Birky testified that Buenting and Dillon prepared his taxes after he became involved with the Aegis trust system. Birky received an audit letter from the IRS in 2001. He sent a letter to the IRS on June 18,

9

2001, which was prepared by Aegis and was given to him by Defendant or Starns.  The letter questioned the IRS agents' authority.  Birky testified that Defendant told him that meeting with the IRS would be an admission of fault.  Birky testified that he also became a plaintiff in a class action by Aegis against the IRS, a suit that was dismissed.  Birky testified that he eventually hired an attorney to resolve his problems with the IRS.  Birky filed amended returns and paid over $100,000 to pay his obligation to the IRS in full.

Robert Donahue testified that he is 83 years old.  He stated that he met Defendant in the 1990s and had several meetings with him regarding tax reduction and asset protection under the Aegis system.  Donahue testified that he started the Aegis plan in 1996.  He wrote a check for $39,000 to Aegis on December 19, 1996, for membership.  He also paid Midwest annual fees for services.  Donahue testified that Buenting did his taxes for several years and then Dillon prepared his taxes.  Donahue testified that he received an IRS notice dated August 30, 1999 stating that the IRS wanted to audit his tax returns for 1997 and 1998.  Donahue testified that Defendant said he would take care of it.  Donahue testified that he has received tax deficiency notices from the IRS and his problems with the IRS are still ongoing.

The Government presented evidence that Cheatham faxed a letter to Defendant and Starns in October 1995.  This letter stated that the IRS was looking at the Aegis system and provided a list of concerns, including tax avoidance through sham transactions and the validity of a charitable trust.  The evidence showed that Defendant was present at an Aegis seminar at the Oaklawn Hilton in June 1996 where Hopper made comments about the "secret" of the Aegis system which was that you "[o]wn nothing but control everything."  In addition, Defendant was present at a seminar in February 1998 where he commented on donations to charity, stating "[n]ow you want to guess what charity

they decided to donate that [to]," indicating that, by using the Aegis system, clients could avoid paying taxes by sheltering income as "charity" while maintaining full control of the income. At the same February 1998 seminar, Vallone stated:

> When we put somebody into a CBO we make them absolutely destitute. In fact they're qualified for food stamps when they leave. Alright. Uhh, I haven't had anybody yet that actually had the nerve to go and apply for them.[2]

In January 1999, Nancy Jones of the IRS sent a letter to Defendant which stated that it was in response to a letter from Defendant. Jones' letter stated that there are people who encourage others to deliberately violate the tax laws, claiming they are not subject to such laws, and it would be unfortunate if Defendant relied on their opinions. The IRS letter also warned Defendant that taxpayers who purchase that type of information often wind up paying more in taxes, interest and penalties than they would have paid simply by filing correct tax returns. The letter stated that they may subject themselves to criminal penalties, including fines and possible imprisonment. The letter ended by stating that "[f]ederal courts have consistently ruled against the arguments which you have made." In April 1999, Defendant attended an Aegis seminar during a cruise to Antigua. During this trip, Attorney Joe Izen discussed the Aegis system and told the attendees that the IRS "will sham the trust on the basis that it took all these deductions which the IRS says is phony so it couldn't have had any valid business purpose and you didn't respect it's separate basises[sic] of the trust entity." He further stated:

---

[2] This court notes that the evidence showed that Kindred, a medical doctor who earned around $1 million per year, did have the nerve to accept $754 for an earned income credit for the 1997 tax year.

If the expense is purely personal, ya know, that's a distribution to

you.  Even if it's an undeclared one from a foreign trust and you need

to put that on your tax return.  Now that's not gonna be popular with

people, but people are gonna get put in jail that don't follow that.

In March 2000, the IRS executed search warrants on various locations including the offices of Aegis and Cover.  The evidence also showed that, when Defendant's clients received audit notices from the IRS, he directed them to send frivolous correspondence to the IRS, challenging the IRS's authority.  This was sometimes referred to as the Aegis "audit arsenal."  In May 2003, the FBI executed search warrants on various locations including the Aegis offices and Vallone's residence.

Wolgamot testified that he heard about Aegis in 1994 from Starns.  He met Defendant in 1994.  Wolgamot testified that he attended various seminars regarding the Aegis system as a way to avoid paying taxes.  Wolgamot testified he attended the seminar where Hopper said, under the system, you "own nothing, but control everything."  Wolgamot testified that he believed the system was legal and worked with Defendant and Starns.  The evidence showed that Wolgamot served as the creator of trust entities for various clients of Defendant and Starns.  Wolgamot testified that Aegis created the Fortress system around 1999 which used a more traditional format that the IRS recognized so that clients would be "under the radar" of the IRS.  As noted previously, Wolgamot plead guilty in this case.  Wolgamot testified that it was a long process that led him away from his earlier conclusion that the system was legal toward an opinion that the system was not legal.  He testified that he did not discuss his change of heart with Defendant or Starns.

Paul Buenting testified that he learned about Aegis through Defendant and Starns and attended an Aegis training seminar in 1995.  Buenting testified that he was interested in the system

because trusts and business returns bring more fees.  Buenting testified that he prepared income tax returns for various Aegis clients, including Kindred.  He testified that, in Kindred's case, the 1996 tax return showed a deduction for the full amount placed in a charitable trust even though nothing was given to charity in 1996.  Buenting testified that Aegis, and Defendant, said this was okay for a charitable trust.  David Dillon also testified.  He stated that he followed Defendant's and Starns' direction regarding how to prepare charitable trust returns and also regarding deductions for personal expenses.  Dillon testified that he felt, from the very beginning, that the documents he prepared using the Aegis system were inaccurate.  He testified that he knew that the deductions for personal expenses were "wrong."

James Pogue testified that he has been an IRS Revenue Agent since 1980.  He testified that the Seventh Circuit Court of Appeals reviewed a decision of the tax court in January 2001 and affirmed the decision regarding Aegis trusts.  Pogue testified that he reviewed the charitable trust returns of the taxpayers involved in this case and determined that none of the 12 qualified for a charitable tax deduction.   Pogue provided summary testimony regarding the amount of taxes underpaid by the taxpayers.  Pogue's summary evidence showed that Defendant and his fellow conspirators caused 12 taxpayers to fraudulently conceal $16,751,548 in income from the IRS and fail to report tax due and owing that exceeded $6 million for the tax years 1994 through 2002.[3]

Defendant introduced two letters, one from the Commission of Continuing Legal Education

_____

[3]  This court notes that Defendant challenged Pogue's testimony as unsupported because his testimony was based, in part, on tax cases that were still in dispute.  Defendant also argued that this court should apply the three-year audit statute of limitations to the calculation of tax loss. This court rejects these arguments.  This court agrees with the Government that a summary witness may properly draw conclusions from the evidence presented at trial.  See United States v. Pree, 408 F.3d 855, 869 (7th Cir 2005); see also United States v. Vallone, 2008 WL 516715, at *5 (N.D. Ill. 2008).  This court further agrees with the Government that Defendant's argument regarding a three-year audit statute of limitations is unsupported and contrary to the applicable law.

of the Supreme Court of Ohio, dated September 30, 1998, and one from the Continuing Legal Education Board of the Supreme Court of Pennsylvania, dated March 15, 2000, both approving an Aegis seminar for continuing legal education credit. Defendant also introduced a video clip from a news show into evidence.

## DEFENDANT'S ARGUMENTS

Defendant argued that the evidence presented at trial was not sufficient to prove a conspiracy, that Defendant acted willfully or that the tax returns were false or fraudulent. Defendant argued that, if a defendant in a tax case believed that he is following the tax laws, the reasonableness of the belief, or rather the unreasonableness of the belief, is not the issue for the trier of fact as long as the defendant sincerely believes he is following the law. See Cheek v. United States, 498 U.S. 192 (1991). Defendant argued that the Government failed to establish that Defendant knew that the Aegis trust system was in fact illegal. He contends that his sincere belief that the tax code allowed for the deductions taken by his Aegis clients means that, under Cheek, this court should find him not guilty on all counts, including the conspiracy count.

Defendant pointed out that most of the taxpayer witnesses testified that at one time they believed that the Aegis plan was legal. Defendant also pointed out that Buenting and Wolgamot testified that they believed the system was legal. He argued that Dillon's testimony that he knew it was inaccurate and "wrong" from the beginning was not credible. Defendant contended that the Government did not show that he was "backdating" documents fraudulently in order to take unauthorized deductions on his client's taxes. He noted that an alleged example of this was the backdating of Brooks' trust documents. He argued that the procedure used by Brooks was not backdating although it "may not be a correct interpretation of the tax laws." He also noted that

14

Donahue filed a tax return to take advantage of tax deductions from a previous year, but contended that this was not backdating. He argued that the "Government can hardly claim that backdating was a usual practice of the defendant with so few examples."

Defendant argued that the evidence of statements made during Aegis seminars does not show the existence of a conspiracy because the seminars were videotaped and not kept secret in any way. Defendant also argued that the videotapes shown during the trial show that Defendant believed in the Aegis system. Defendant argued that the documents and video clip he entered into evidence showed that he believed the system was legal. He argued that the documents would impress a layman and gave the impression that two Supreme Courts and a continuing legal education board accepted the Aegis system as legal. He argued that the video clip showed that a similar trust program was accepted as legal and, to a layman, would make it appear that Aegis had found the secret to lowering taxes just as rich people do. Defendant noted that he has never claimed to be a tax lawyer or accountant and he sincerely believed that the deductions he counseled were legitimate. He pointed out that the Aegis directors at the seminars quoted chapter and verse on code and law to their audience and also noted that other professionals he dealt with did not tell him of any misgivings about the system.

Defendant argued that, although he sometimes supplied numbers for tax returns, this fact alone was insufficient to prove, beyond a reasonable doubt, that he caused anyone to file falsely. Defendant also argued that Count 2 is time-barred because the conduct charged occurred more than six years prior to the indictment.


FINDINGS OF THE COURT

15

This court first finds that the Government proved the existence of a conspiracy beyond a reasonable doubt.  Therefore, all of the exhibits and evidence which were conditionally admitted by this court based upon the Government's Santiago proffer are hereby admitted into evidence and have been considered by this court.  This court accordingly overrules Defendant's objection that the evidence presented was not sufficient to show the existence of a conspiracy so the evidence of co-conspirator statements should not be admitted into evidence.  This court also agrees with the Government that the evidence of Defendant's guilt on all of the charges against him is overwhelming.  Accordingly, as more thoroughly explained below, this court finds Defendant guilty of all of the charges included in the third superseding indictment.

## COUNT 1 - CONSPIRACY

This court concludes that the Government proved Defendant guilty of conspiracy beyond a reasonable doubt.  To prove the elements of a conspiracy to defraud the IRS, in violation of 18 U.S.C. § 371, the Government had to prove: (1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, *i.e.*, to defraud the United States.  United States v. Furkin, 119 F.3d 1276, 1279 (7th Cir. 1997).  The "intent" element of § 371 requires the Government to prove "not that the conspirator was aware of the criminality of the objective, but that the conspirator knew of the liability for federal taxes."  Furkin, 119 F.3d at 1279, quoting United States v. Cyprian, 23 F.3d 1189, 1201 (7th Cir. 1994).  "The parties' intent, as well as their agreement, may be inferred from circumstantial evidence concerning the relationship of the parties, their overt acts, and the totality of their conduct."  Furkin, 119 F.3d at 1279, citing United States v. Marren, 890 F.2d 924, 933 (7th Cir. 1989).

16

This court agrees with the Government that the evidence at trial established that, as part of the conspiracy, Defendant and his fellow conspirators, including Starns, Dillon, Wolgamot, Vallone, Hopper and Bartoli, devised, organized, promoted and sold domestic and foreign trusts to numerous federal taxpayers. The object of the conspiracy was to defraud the United States by attempting to fraudulently conceal taxpayers' assets and income from the IRS and illegally reduce or eliminate their income tax liability. The Aegis system was used to sell financial instruments known as "trusts," "common law business organizations," "business trusts" and "CBOs" to federal taxpayers. They caused taxpayers to use their trusts to engage in a series of sham paper transactions having no economic substance or business purpose, which resulted in concealment of income from the IRS and the attempted illegal reduction or elimination of income tax liability. The evidence presented at trial showed that, in all, Defendant and the other conspirators assisted a total of 12 taxpayers using the Aegis system to fraudulently conceal more than $16,000,000 in income from the IRS, resulting in a tax loss to the United States of more than $6,000,000 and resulting in fees and commissions of more than $490,000.

Based upon this evidence, this court concludes that the Government proved, beyond a reasonable doubt, that there was an agreement to accomplish an illegal objective against the United States, that there were many overt acts in furtherance of this illegal purpose and that Defendant had the intent to defraud the United States. This court notes that it has rejected Defendant's rather undeveloped argument that this court should not consider evidence of tax returns filed prior to October 2000 because they would be outside the applicable six-year statute of limitations. See 26 U.S.C. § 6531. This court agrees with the Government that there is no statute of limitations problem in this case. The Government's evidence proved that the conspiracy lasted from 1994 to 2003 and

17

overt acts in furtherance of the conspiracy continued well into 2003.  Because there was an overt act within five years prior to the indictment date of May 2, 2007, all of the actions of Defendant and his fellow conspirators in furtherance of the conspiracy are part of the conspiracy no matter when the conduct started.  See United States v. Useni, 516 F.3d 634, 655-56 (7th Cir. 2008); United States v. Yashar, 166 F.3d 873, 875-76 (7th Cir. 1999).

As noted previously, Defendant has argued that he sincerely believed that the Aegis system was legal, so the Government did not prove that he acted with the intent to defraud.  In Cheek, the United States Supreme Court stated that the Government's burden in a case involving violation of the tax laws requires "negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws."  Cheek, 498 U.S. at 202.  The Court stated that, "[i]n the end, the issue is whether, based on all the evidence, the Government has proved that the defendant was aware of the duty at issue, which cannot be true if the jury[4] credits a good-faith misunderstanding and belief submission, whether or not the claimed belief or misunderstanding is objectively reasonable."  Cheek, 498 U.S. at 202.  Based upon Cheek, the Seventh Circuit Federal Jury Instructions (Criminal) include the following instruction to be given in income tax cases:

A defendant does not act willfully if he believes in good faith that he is acting within the law, or that his actions comply with the law.  Therefore, if the defendant actually believed that what he was doing was in accord with the tax statutes, he cannot be said to have had the criminal intent to willfully [evade taxes; fail to file tax

---

[4]  In this case, this court is the trier of fact because of Defendant's written waiver of his right to be tried by a jury.

returns; make a false statement on a tax return].  This is so even if the
defendant's belief was not objectively reasonable, as long as he held
the belief in good faith.   However, you may consider the
reasonableness of the defendant's belief together with all the other
evidence in the case in determining whether the defendant held the
belief in good faith.

Seventh Circuit Federal Jury Instructions (Criminal) 6.11.

After hearing all of the evidence, this court concludes that the Government presented
overwhelming evidence that Defendant did not have a good faith belief that what he was doing was
in accord with the tax statutes.  This court concludes that the evidence regarding the "audit arsenal"
Defendant encouraged his clients to use when dealing with audit requests shows that Defendant did
not believe the Aegis system was legal.  Instead of encouraging clients to cooperate with the IRS,
he encouraged them to question the authority of the IRS and, in some cases, to claim to not be
citizens of the United States.[5]  Bugg testified that Defendant told him not to cooperate with the IRS
because it would cause problems for others.  Doug Frichtl testified that Defendant was involved in
refusing to give books and records related to the Aegis system to the IRS.  Brooks testified that
Defendant told him to be "careful" in getting out of the system.  This court concludes that all of this
behavior was not consistent with a belief that the Aegis system complied with the tax laws.
Cheatham testified that, when Defendant advised him to use the "audit arsenal," it made him think
that the system was not legal.  This court concludes that Defendant knew this as well.  In fact, Bugg
testified that Defendant told him to "use the Fifth Amendment."  Defendant would not have believed

---

[5]  Defendant has included several arguments regarding why the statement disclaiming
citizenship is not as bad as it sounds, but this court does not find the arguments convincing.

19

there was a danger of self-incrimination if he really believed that the system was legal.  Moreover, Birky testified that Defendant told him that meeting with the IRS would be an admission of fault. There would not be "fault" if the system was legal.

In addition, Kindred testified that he faxed Defendant's company, Midwest, a copy of a letter he received from Merrill Lynch in June 1998.  In the letter, Merrill Lynch stated that the type of trusts used by the Aegis system could be used to illegally shelter assets from the IRS and were the subject of an ongoing IRS investigation.  Defendant was concerned enough about this letter that he faxed it to Vallone and asked how Vallone wished to proceed  The evidence also showed that Defendant received a letter from the IRS in January 1999 warning him of the dangers of participating in this type of tax avoidance system.  The evidence showed that Defendant attended a lecture by Izen in April 1999 where Izen essentially told the attendees that some aspects of the Aegis system were not legal and would not be accepted by the IRS and that "people are gonna get put in jail."  Defendant also had reason to know that the system was not legal when raids of the Aegis offices began in May 2000.  This court cannot conclude, in the face of this evidence, that Defendant had a good faith belief that he was acting in accord with the tax statutes, even considering the documents and video clip that Defendant presented at trial.  This court concludes that Defendant did not believe in the legality of a system that resulted in clients with large incomes paying almost nothing in taxes, based in part on sheltering income by putting it in charitable trusts where almost nothing was actually contributed to charity.  Defendant is guilty of Count 1 of the superseding indictment.

## AIDING THE FILING OF A FALSE TAX RETURN

Defendant was charged with the offense of aiding the filing of a false tax return in Counts

2 through 7 of the third superseding indictment, in violation of 18 U.S.C. § 7206(2).  Section 7206(2) imposes criminal sanctions against one who:

> willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document.

United States v. Hooks, 848 F.2d 785, 788 (7th Cir. 1988), quoting 26 U.S.C. § 7206(2).  The essential elements of this offense are (1) that the defendant aided, assisted, procured, counseled, advised or caused the preparation and presentation of a return, (2) that the return was fraudulent or false as to a material matter, and (3) that the act of the defendant was willful.  Hooks, 848 F.2d at 788-89.  The Seventh Circuit has made clear that "[s]ection 7206(2) has a broad sweep, making all forms of willful assistance in preparing a false return an offense."  Hooks, 848 F.2d at 791.  The "scope of the statute extends to all participants of a scheme which results in the filing of a false return, whether or not those parties actually prepare it."  Hooks, 848 F.2d at 791.

This court concludes that the Government has proved Defendant guilty, beyond a reasonable doubt, of the offenses charged in Counts 2 through 7 of the third superseding indictment.  The evidence showed that Defendant was actively involved in promoting the Aegis system and encouraging his Aegis clients to file tax returns which fraudulently omitted income earned by the clients and fraudulently included improper and illegal deductions.

This court also concludes that the evidence showed, beyond a reasonable doubt, that Defendant acted willfully.   In <u>Cheek</u>, the Court defined the "willfulness" described in the criminal tax laws as requiring proof of a "voluntary, intentional violation of a known legal duty." <u>Cheek</u>, 498 U.S. at 200.   This court concludes that the Government proved that Defendant knew it was a taxpayer's duty to file truthful individual tax returns and intentionally aided and assisted others in filing returns which were false as to material matters.   For all of the reasons previously stated, this court rejects Defendant's argument that he believed in good faith that the Aegis system was legal and therefore did not act willfully.

In Count 2, Defendant was charged with aiding the filing of a false tax return for Brian Brooks for the calendar year 1999, in that Defendant, on or about September 24, 2000, caused Brooks to falsely and fraudulently fail to report approximately $132,000.00 in taxable income.  This court concludes that the Government proved this charge beyond a reasonable doubt.  This court further concludes that Defendant's argument that this Count is barred by the statute of limitations is without merit.  The documents admitted into evidence show that Brooks' 1998 tax returns were mailed on September 22, 2000.  Since the original indictment charging the offense was returned on September 8, 2006, this charge was made within the applicable statute of limitations of six years. <u>See</u> 26 U.S.C. § 6531.

In Count 3, Defendant was charged with aiding the filing of a false tax return for Brian Brooks for the 2000 tax year, in that Defendant, on or about August 17, 2001, caused Brooks to falsely represent that the taxable income shown on line 39 was $5,632, when in fact Brooks' income was approximately $96,896 more than reported on the original Form 1040 tax return.  This court concludes that the Government proved this charge beyond a reasonable doubt.

In Count 4, Defendant was charged with aiding the filing of a false tax return for Brian Brooks for the 2001 tax year, in that Defendant, on or about October 18, 2002, caused Brooks to represent that the taxable income shown on line 39 was $41,912, when in fact Brooks' income was approximately $68,890 more than that reported on the original Form 1040 tax return. This court concludes that the Government proved this charge beyond a reasonable doubt.

In Count 5, Defendant was charged with aiding the filing of a false tax return for William Steinmetz for the calendar year 1999, in that Defendant, on or about October 15, 2000, caused Steinmetz to falsely and fraudulently fail to report approximately $612,000 in taxable income. This court concludes that the Government proved this charge beyond a reasonable doubt.

In Count 6, Defendant was charged with aiding the filing of a false tax return for William Steinmetz for the 2000 tax year, in that Defendant, on or about August 17, 2001, caused Steinmetz to falsely represent that the taxable income shown on line 39 was $44,738, when in fact Steinmetz' income was approximately $478,098 more than that reported on the original Form 1040 tax return. This court concludes that the Government proved this charge beyond a reasonable doubt.

In Count 7, Defendant was charged with aiding the filing of a false tax return for Robert Donahue for the calendar year 1999, in that Defendant, on or about October 18, 2000, caused Donahue to falsely and fraudulently fail to report approximately $824,000 in taxable income. This court concludes that the Government proved this charge beyond a reasonable doubt.

MOTION FOR FUNDS FOR EXPERT

On August 27, 2009, Defendant, through counsel, filed a Motion for Funds for Expert (#94). Defendant stated that, in the event that sentencing or other issues arise after this court's ruling on law and facts following the bench trial, "there may not be sufficient time to retain an expert in

23

taxation prior to hearing on those issues nor for an expert to review those issues." Defendant stated that recent case law suggests that counsel should retain a tax expert in tax fraud cases such as this one to assist in sentencing issues. Defendant stated that he had contacted Roger W. Stone of Champaign, Illinois, who is a Certified Fraud Examiner. Defendant attached Mr. Stone's resume and stated that he bills at a rate of $125.00. Defendant stated that he continues to be indigent and asked this court to authorize funds sufficient to compensate Mr. Stone for his assistance in this case.

Under 18 U.S.C. § 3006A(e), this court can authorize counsel "to obtain investigative, expert, or other services necessary for adequate representation" after determining that the services are necessary and the person is financially unable to obtain them. 18 U.S.C. § 3006A(e)(1). However, compensation to be paid to a person for services rendered under this subsection shall not exceed $1,600 "unless payment in excess of that amount is certified by the court . . . and the amount of the excess payment is approved by the chief judge of the circuit." 18 U.S.C. § 3006A(e)(3).

Because this court has now found Defendant guilty of all of the charges against him, this court concludes that the services of a tax expert are necessary to assist Defendant regarding sentencing issues. Therefore, Defendant's Motion for Funds for Expert (#94) is GRANTED. However, as noted, the compensation to be paid to the expert cannot exceed $1,600 without certification by this court and approval by the Chief Judge of the Seventh Circuit Court of Appeals. Accordingly, funds for a tax expert are approved, but cannot exceed $1,600.

IT IS THEREFORE ORDERED THAT:

(1) This court finds that the Government proved, beyond a reasonable doubt, that Defendant is guilty of Count 1, Count 2, Count 3, Count 4, Count 5, Count 6 and Count 7 of the third superseding indictment. Accordingly, this court finds Defendant guilty of all of the charges included

in the third superseding indictment.

(2)  Defendant's Motion for Judgment of Acquittal (#97) is DENIED.

(3)  Defendant's Motion for Briefing Schedule and Leave to File Reply Brief (#100) is DENIED.

(4) This case remains set for a status conference on December 8, 2009, at 1:30 p.m. so a sentencing hearing can be scheduled.

(5) Defendant's Motion for Funds for Expert (#94) is GRANTED.  Funds for a tax expert are authorized up to the statutory maximum of $1,600.

ENTERED this 4th day of December, 2009

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE